IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT

| | |
|---|---|
| **SHELLEY KALLOP**, <br> 12601 Piscataway Road <br> Clinton, MD 20852 <br><br> Plaintiff, <br> v. <br><br> **JEWISH FOUNDATION FOR GROUP HOMES, INC.** <br> 1500 East Jefferson Street <br> Rockville, MD  20852 <br><br> <u>Serve</u>:  Resident Agent <br> The Corporation Trust Incorp. <br> 2405 York Road <br> Suite 201 <br> Lutherville Timonium MD 21202-2264 <br><br> Defendant. | **CIVIL ACTION FILE NO.** |

## COMPLAINT

Plaintiff, Shelley Kallop ("Ms. Kallop" or "Plaintiff"), by and through her undersigned counsel, hereby brings this Complaint against Jewish Foundation for Group Homes, Inc. ("Defendant"), by averring as follows:

## INTRODUCTION

1. The present lawsuit is a make-whole action to address willful and deliberate wage theft and involves claims for unpaid regular and overtime wages in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq*., ("FLSA").

2. Plaintiff was a covered, non-exempt employee under the applicable federal wage and hour laws, and, as such, was entitled to be paid wages and overtime pay for all hours worked

1

consistent with the requirements of the FLSA.

3. All the relief sought herein is to remedy Defendant's failure to pay all wages and overtime owed to Ms. Kallop, in addition to enhanced damages, pre and post-judgment interest, reasonable attorneys' fees and costs, declaratory relief, as well as all other relief as these causes and the law may permit.

4. These claims and the facts which support them are referred to as the "Lawsuit."

5. The period for which Ms. Kallop seeks recovery is from three years preceding the filing of this Lawsuit through April 27, 2021 ("Period of Relief").

## PARTIES

6. Ms. Kallop is a resident of the State of Maryland who, at all times relevant to this Lawsuit, was an "employee" within the meaning of the FLSA.

7. Defendant Jewish Foundation for Group Homes, Inc. (hereinafter "JFGH") is a non-stock corporation formed under the laws of the State of Maryland. JFGH operates a host of residential care facilities (*i.e.*, group homes) and provides living assistance and support programs to individuals with developmental disabilities throughout the greater Washington, D.C. metropolitan region. JFGH maintains its principal place of business in Rockville, Maryland.

8. JFGH is licensed by the State of Maryland and it operates, and obtains funding through federal, State, and local government authorities, as well as private contributions. JFGH is funded, in part, by an endowment managed by the Jewish Foundation for Group Homes Endowment, Inc., a related not-for- profit Internal Revenue Code §501(c)(3) corporation formed under the laws of the State of Maryland.

9. JFGH is engaged in the production of goods for interstate commerce and/or uses and handles goods that have moved in interstate commerce as such terms are defined in the

FLSA and is an "employer" subject to the FLSA within the meaning of that statute.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this Lawsuit pursuant to 28 U.S.C. § 1331.

11. Ms. Kallop has signed a consent form to pursue this Lawsuit and assert claims arising under the FLSA, attached hereto as Exhibit 1.

12. Venue is proper in the Greenbelt Division of the United States District Court for the District of Maryland under 28 U.S.C. § 1391(b)(2), as a substantial part of the events and decision making giving rise to this Lawsuit occurred in this District, and because JFGH conducts business and maintains its principal place of business in Montgomery County.

## FACTS

13. Ms. Kallop began full time employment with JFGH in or around August of 2014 and held the position of Direct Support Professional ("DSP").

14. At all times relevant to this lawsuit, Ms. Kallop was assigned to a JFGH group home referred to as the Brown-Berish Home (the "BBH Facility").

15. Ms. Kallop's primary duties as a DSP were manual in nature and involved assisting individuals at the BBH Facility with developmental disabilities in activities of daily living ("ADLs") including, but not limited to: personal care (e.g., toileting, bathing, grooming, dressing, eating); use of community resources; monitoring health and physical condition and assisting with medication; addressing adaptive and social behavior; ensuring individual health and safety among many other duties and responsibilities.

16. Ms. Kallop's duties did not involve the exercise of meaningful discretion or independent judgment regarding important business matters. Furthermore, Ms. Kallop was not a

learned professional who required licensure by any state or local authority for the performance of her primary duties.

17. In fact, upon information and belief, JFGH's only required educational qualification for the position of DSP was a high school diploma or GED equivalent.

### Classification and Rate of Pay

18. At all times relevant to this Lawsuit, Ms. Kallop was classified as an hourly non-exempt employee, meaning that she was entitled to receive an hourly regular rate of pay, plus time and a half overtime pay for each hour worked each week in excess of 40 hours in any workweek.

19. As of August 7, 2018, Ms. Kallop's regular rate of pay was $17.49 dollars per hour worked, and her hourly rate of pay increased several times in the ensuing years of her employment with JFGH.

20. Throughout her employment, Ms. Kallop was paid by JFGH on a bi-weekly basis.

### Schedule (Pre-COVID)

21. Between August 7, 2018 and April 7, 2020, Ms. Kallop worked weekly on what JFGH internally referred to as a "split-schedule."

22. Specifically, Ms. Kallop worked Monday through Friday from approximately 2:00 pm to 9:00 pm, and then again from 4:00 am to 8:00 am each consecutive day, which was 44 hours each week. JFGH paid Ms. Kallop her regular rate of pay during these hours, and an overtime premium for more than 40 hours each week.

23. In addition to the split-schedule hours, Ms. Kallop was expected to remain overnight between her schedules at the BBH Facility (9:00 pm through 4:00 am) four times each

week. JFGH referred to these as "Overnight Periods." JFGH paid Ms. Kallop a so-called stipend of $30 dollars for each such Overnight Period.

24. Ms. Kallop was required to stay on the premises from 2 p.m. to 8 a.m. each day and only allowed to leave the BBH Facility during the work week to return home only from 8:00 am to 2:00 pm each day (and weekends). Ms. Kallop worked less than 24 hours each day during this period and did not reside on the premises.

### Failure to Pay All Regular and Overtime Wages for Overnight Periods

25. Under the FLSA and its interpretive regulations, "[a]n employee who is required to be on duty for less than 24 hours is working even though [s]he is permitted to sleep or engage in other personal activities when not busy." 29 C.F.R. § 785.21.

26. By failing to pay Ms. Kallop her regular rate of pay and overtime premium (where applicable) for all hours during the Overnight Periods referred to herein, JFGH violated federal wage and hours laws.

27. Apart from the less than 24 hour rule, JFGH would still be responsible and liable for failing to remit regular and overtime pay for the Overnight Periods because Ms. Kallop routinely suffered or was permitted to work at the BBH Facility during these Overnight Periods.

28. While JFGH recruits for and advertises their DSP positions as "Full-Time Weekday with Sleep," in Ms. Kallop's experience there was no uninterrupted sleep during these Overnight Periods.

29. During these Overnight Periods, Ms. Kallop was required to assist individuals in their ADLs and other tasks attendant to the needs of her position for the benefit of JFGH. When she was not actively performing duties, she was on-call.

30. Ms. Kallop was not permitted or free to leave the facility during the Overnight Period and was the sole staff on duty at the BBH Facility, which housed developmentally disabled individuals who could not be left alone.

31. Not only was she not paid for a less than 24 hour period, but because of the requirements of her position Ms. Kallop was not afforded meaningful sleep or periods of rest during the Overnight Periods, and JFGH violated federal wage and hours laws by failing to pay Ms. Kallop for all of her regular hours worked and her overtime premiums during the Overnight Period at issue.

### COVID and Changes to Terms and Conditions of Employment

32. In late January of 2020, the first confirmed coronavirus disease (known as COVID-19 or SARS COV-2) was announced by the Centers for Disease Control, then accelerated rapidly throughout the United States in the ensuing weeks and months.

33. On March 11, 2020, the World Health Organization declared a worldwide pandemic. A national emergency was declared in the United States, and the Governors in the states in which JFGH does business issued "Stay at Home" Executive Orders requiring the closure of all non-essential businesses on or about March 30, 2020.

34. JFGH exempted itself from the Stay at Home Order by self-identifying as an "essential business," and further designated Ms. Kallop as an "essential employee."

35. On or about April 8, 2020, JFGH changed Ms. Kallop's terms and conditions of employment by requiring her to remain at the BBH Facility 24 hours a day, seven days a week even though she did not reside on the premises. JFGH instituted this policy change as to Ms. Kallop to lessen the potential chance for COVID to enter the facility.

36. During this period, JFGH also increased her hourly rate by $2 dollars per hour to account for hazard pay. This meant overtime pay increased by $3 dollars per hour. JFGH referred to this hazard pay on their payroll records as "COVID pay."

Failure to Pay All Regular and Overtime Wages

37. Upon being sequestered at the BBH Facility beginning in April of 2020, Ms. Kallop was scheduled to work seven days a week, from approximately 5:00 am through 9:00 pm each day. From 9 p.m. until 5 a.m., Ms. Kallop was required to remain on premises and was not free to leave. With a few exceptions, Ms. Kallop remained at the BBH Facility 24 hours a day, seven days a week until her separation in April of 2021.

38. As before, JFGH did not pay Ms. Kallop her hourly rate or any overtime pay during her eight hours - from 9:00 pm to 5:00 am. JFGH paid her a $30.00 dollar per night "stipend."

39. At no time did Ms. Kallop agree to a bona fide arrangement with JFGH whereby she would not be paid during a regularly scheduled sleeping period of 8 hours, and at no time did Ms. Kallop declare her residence or otherwise reside at the BBH Facility.

40. Ms. Kallop continued to maintain a separate residence outside of the BBH Facility, did not change her driver's license address or take any of actions which may constitute an indicium of change of residency. She continued to pay her rent, utilities, and continue all other vestiges of having her own residence away from JFGH even though she was prohibited from leaving the JFGH facility.

41. Furthermore, Ms. Kallop was not able to have her entire wardrobe, personal effects, belongings, accoutrements, and privacy that one would associate with residing at the BBH Facility and was unable to engage in her normal private pursuits.

42. In addition to not being allowed to leave the premises, Ms. Kallop was forced to endure below standard and inadequate living sleeping facilities. Ms. Kallop was given a used, stained mattress and box spring in the BBH Facility basement. This so-called bedroom was plagued with moisture, mold, spiders, cave crickets and even reports of live snakes. There were no dressers or accommodations for hanging clothes or keeping personal belongings, and Ms. Kallop had to share the mattress with other staff.

43. In addition, the room in which Ms. Kallop slept had a Verizon backup battery mounted on the wall which made repeated loud beeping sounds throughout the night, which continuously woke up Ms. Kallop from her sleep.

44. Due to the poor and inadequate living conditions, Ms. Kallop was never able to get more than two hours of uninterrupted sleep while sequestered at the BBH Facility, and never five hours of uninterrupted sleep in any one night. Moreover, on many occasions Ms. Kallop's sleep was interrupted due to the needs of her job and to attend to the ADLs of the facility's occupants.

45. For these and other reasons, all of Ms. Kallop's time while sequestered was compensable. By failing to pay Ms. Kallop her regular rate of pay and overtime premium (where applicable) for all hours during the Overnight Periods referred to herein, JFGH violated federal wage and hours laws.

46. Ms. Kallop separated from JFGH on or about April 27, 2021.

47. Subject to further review of JFGH's records, Ms. Kallop is owed at a minimum the sum certain of $108,883.00 dollars in unpaid regular and overtime premiums, not including liquidated damages which are sought herein.

48. Attached as <u>Exhibit 2</u> to this Complaint is a Chart setting forth Ms. Kallop's hours

worked and unpaid regular and overtime pay based on the allegations in this Lawsuit. The Chart is based on JFGH's bi-weekly payroll records and is subject to revision based upon further review of JFGH's *weekly* records of Ms. Kallop's time and hours worked which they are required to maintain pursuant to federal and state law.

49. The refusal and failure to pay wages and overtime was not the result of a bona fide dispute and was done willfully and intentionally, justifying an award of liquidated and treble damages under federal law.

## COUNT ONE
## FAIR LABOR STANDARDS ACT
(Failure to Pay Regular and Overtime Wages)

50. Plaintiff incorporates by reference all allegations contained in the Complaint as if more fully set forth herein.

51. At all times relevant to this Lawsuit, Defendant was an "employer" and Plaintiff was an "employee" within the meaning of the Fair Labor Standards Act ("FLSA").

52. Defendant willfully and/or intentionally failed and/or repeatedly refused to pay to Plaintiff all wages and overtime wages due and owed under the FLSA for the Period of Relief set forth in this Lawsuit.

53. The Defendant's actions and inactions were in willful disregard for the rights of Plaintiff under the FLSA, and not the result of a good faith or bona fide dispute. As a result of their actions and inactions, Plaintiff suffered a loss of wages.

54. Plaintiff is owed unpaid minimum wages and overtime wages by Defendant as allowed under 29 U.S.C. §§ 206 and 207 in an amount consistent with the allegations herein and as set forth on Exhibit 2 to this Complaint, respectively, or as the result of a review of Defendant's records and at the trial of this action.

55. In addition to any judgment awarded for minimum and overtime wages, Plaintiff is entitled to an award of liquidated damages equal to the amount of damages, in addition to pre and post-judgment interest, costs of the action, and reasonable prevailing party attorney's fees. 29 U.S.C. § 216(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendant on all causes of action and seeks the following for each Plaintiff:

A. Unpaid regular wages and overtime in the amounts as set forth on Exhibit 2 to this Complaint, respectively, or more as the evidence will support;

B. Liquidated damages under the FLSA equal to the value of unpaid regular and overtime wages as the evidence will support;

C. Reasonable attorney's fees and costs;

D. Pre and post-judgment interest; and

E. And such other penalties and monetary, declaratory, and equitable relief as the nature of her causes may require.

Respectfully submitted.

By: _____/s/_____
Ruth Ann Azeredo (MD 16175)
Law Office of Ruth Ann Azeredo LLC
1997 Annapolis Exchange Parkway
Suite 300
Annapolis, Maryland 21401
Tel: (410) 558-1915
Fax: (410) 558-19177
ruthazeredo@comcast.net

Timothy W. Romberger
Fed. Bar No. 014408

                                                                             1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C. 20046
(202) 248-5053
timromberger1@comcast.net
Attorneys for Plaintiff

Dated:  August 11, 2021